The next case will be 061434, Boston Scientific v. Medtronic. In this appeal there are two issues, one I'll call the section 119 interpretation issue and the other is the section 146 scope of proceeding issue. I'm happy to address questions with regard to the second one, but I'll focus my time today on the section 119 issue. In most countries, a patent applicant is not an inventor. The United States is one of the very few countries in the world where that is required. Instead, in most foreign jurisdictions, including those that were the subject of our experts' reports, inventors join the foreign applications later, sometimes by assignment, sometimes by operation of law, before the application matures into a patent. Section 119A and the Paris Convention Article 4A1, that all agree it's designed to implement, attempt to take these international differences into account when issues of cross-border priority are issued. The district court's interpretation of section 119A in this case, however, gives no respect to the regular national filings that are made under the jurisdictions of these other countries. Under the interpretation given by the district court and urged by our opponents here, virtually no foreign application will be given priority rights because foreign practitioners simply don't seek these assignments before they make the application in those countries. Our construction of section 119, on the other hand, will give effect to those regular national filings. It's true to the statutory language, and it makes the statute coherent with the United States' international obligations under the Paris Convention. Now, if I could turn to the main reason given by both the board and the district court for ruling against our Crawford interpretation of section 119A, it was a concern about commodification of foreign applications. And we pointed out in our briefs that that concern is amply taken care of under the Vogel case and under later language in section 119A, specifically the language that requires that the application be for patent for the same invention. And under the interpretation given in Vogel, that wouldn't allow us, for example, to go by Fogarty's patent rights, the ones that were in the priority challenge against us. We couldn't do that because that's not an application for the same invention. That was an entirely different set of inventors working differently together. Here, on the other hand, the facts of our case show that we're claiming to the same application. Yes, there were some differences and some concerns in the application process over who exactly the proper inventors were. But in our case, it's quite clear that the invention being, the priority that we are seeking goes to the same invention that is the subject of the United States application as well. The Raft case decided by this court a couple of years ago, I believe, actually involves many of the same issues here, but under the context of the Lanham Act, in a particular section of the Lanham Act. And we'd actually urge that the Raft case is generally the approach that this court ought to take, with one exception. And that is that in Raft, the court, or at least Judge Bryson, the majority of the court, held that the statute there was clear. And so there was no reason to resort to, say, Charming Betsy or other interpretive doctrines to interpret it, because it was quite clear. Here, we have a very different statute, a very different level of clarity. And Professor Adelman's report, our briefs, both set forth that there are at least two, maybe three, competing, reasonable, even if I give my brothers on the other side and their interpretation the benefit of the doubt, interpretations. And so how do you resolve the ambiguity? And the answer is you look in the same way that the Raft case did, although it ultimately decided not to rely on Charming Betsy because of the lack of ambiguity. You look to the Paris Convention. And what we see in the Paris Convention is language that suggests very strongly that the filing of the application, a regular national filing, should give rise to a priority one. Now, let me also address another argument made by our opponents here. And that is the notion that the Paris Convention doesn't have any Charming Betsy application here because it's not self-executing. And I would think Raft actually answers that question for you, because in that opinion, Judge Dyke's opinion for the court, it starts by saying we find that the Paris Convention is not self-executing. It then goes on to separately discuss the question of the Charming Betsy doctrine and its applicability to the case. Beyond Raft, of course, other cases that have been cited in our brief, including the Federal Mogul case and the Luigi Mormoli case, both of those were cases involving interpreting a statute to be consistent with GATT. Well, I'll agree. I'll understand that GATT itself is not self-executing. Yet GATT supplied the interpretive principle to resolve the ambiguity in those cases. Now, on top of all of that, the Charming Betsy doctrine is a particularly important doctrine of interpretation. It's so important, actually, that I think if you read the language of Charming Betsy itself, it doesn't even require ambiguity to be triggered in the first instance. If you go back to other cases in the Supreme Court, say the Horizen case from back in 1953, you find that the Supreme Court in that case said the statute's clear, but we're still going to interpret it consistent with Charming Betsy. And it's an important doctrine. Of course, the Court said in more recent cases, including the international antitrust case involving vitamins, the Hoffman-LaRoche case, it's an important doctrine because it helps the potentially conflicting laws of different nations here, I'm quoting the actual opinion, work together in harmony. Harmony particularly needed in today's highly influential world. So you're suggesting that even if we find that the statute is clear and unambiguous, we should still apply the Charming Betsy doctrine? Well, I don't suggest that here because I don't have to. But I do want to... Well, you're not sure whether you have to. Fair enough. I'm certainly happy to go into greater detail about why the statute isn't crystal clear on its face, although I think we've done that in our briefs and I think our expert reports have done that. But I do think there's authority for that. We haven't really briefed that issue because it's so clear that the statute is at least at best, at best for the other side of ambiguous, at worst for us ambiguous. In my view, the adverbial phrase about has or have previously filed doesn't say anything about when the legal representatives who are assigned have to acquire that status. So the court here is faced really with a choice of interpretive doctrines. It can take the approach taken by the district court, which really didn't even say explicitly that it found the language plain. It just says generally agreed with the board's interpretation. And rely upon this commodification concern, which we've already shown is aptly addressed by another portion of the statute. Or it can read the statute consistently with the Paris Convention and Article 4A1 in particular, which given the practices in these foreign countries, will avoid having millions and millions of foreign patents not be accorded priority rights simply because the applicants and the attorneys in those foreign countries followed the ordinary process in those countries and yet got caught in what we call in our brief a trap for the unwary. It truly is an absolute gotcha when you do exactly what is required in those foreign jurisdictions. But you've, I mean, as the other side points out, that you've observed that the vast majority, in their brief they said, the vast majority of European patent applications are filed by employers on behalf of their employees. So you're asking us to be persuaded by the fact that there are millions of patents out there, and where's the record that unambiguously establishes that there are? Well, I don't know that I, first of all, that I have a record that unambiguously establishes that. I do think we have made a record through the, again, the expert reports and the statements of our three experts, Professor Avon, Mr. Crump, and Dr. Getty, each of whom explain what the ordinary practice is in these countries. And it's, as we've pointed out in our brief also, with regard to the employer-employee relationships, it seems to me that under the district court's interpretation of Section 119 that's under review here, it is at best an open question whether those applications would satisfy that rule. And I point before Judge Prost to the Rule 28J letter that we submitted to the court involving the Northern District of California case. That's a case where the relationship was employer-employee. And yet the district court in that case relied upon the board decision in our case here, and upon the district court decision, and said, sorry, you didn't assign beforehand to that. Now, I realize that case is not before you, and it's one data point, but it's an important data point about what the decision in this case will read on foreign priority applications under Section 119. Now, unless the court has other questions, I'll save the rest of my time for the vote. All right. Mr. Ferguson. Thank you, Your Honor. May it please the court, Ryan Ferguson for Medtronic. The decisions of the board and the district court were correct because they are grounded in the plain meaning of Section 119. As both the board and the court recognized, assignment can point to no precedent nor any towards its novel interpretation of Section 119. The statute focuses on the invention, and it links the invention that is set forth in both the foreign filing and the U.S. filing to a person. That person is the inventor. As Judge Markey stated in the Frommsen v. Western Lithow case, the patent system encourages inventors to invent and disclose. Corporations don't invent. People do. The legal representatives or assigns that are referred to in Section 119 are merely those who may act on the inventor's behalf in filing applications for him or her. There must be a link between the legal representative and assign and the person, the inventor, when the foreign application is filed because otherwise the legal representative or assign could not have previously regularly filed an application for the invention for that person. This is exactly the board held. What do you understand? Help me out with the meaning, as you see it, of legal representative or assign. How broadly does that sweep in all forms of agency? Certainly, I think assign, there is a legal meaning to the term assign. In patent law, it is a formal written document that assigns rights from one person to an entity. Okay, legal representative. Do you think some kind of power of attorney is required? I think a legal representative may be interpreted as anyone or any company that has the right, based on the relationship that it has with the inventor, to take an action on that inventor's behalf. No matter how informal the expression of agency might be, if I say to Judge Prost in a situation in a jurisdiction where this would be allowed, we'll go file this for me, that she becomes my legal representative, do you think, or is there something more formal that's intended by that? I think what we need to do then, Your Honor, is we need to look at some of the precedent that was in place before the inaction of Section 119. And the Vogel case, that of course interprets Section 119, cites to a couple of decisions, the Dijon v. Goss case and the Steele v. Myers case, and in both of those cases, in the Dijon case, there's a German application that was filed. This is 23 F. 2nd 762. It was filed by the company with the consent of the inventors. And then in the Steele v. Myers case, what the Commissioner of Patents said, now this goes back to 1914, it was Applying RS 4887. The Commissioner said that a claim for priority would be recognized if the application, the foreign application, was filed by him, the inventor, or with his knowledge and consent. So again, I believe that we have to look to that language and that precedent because there really is no legislative history here that I think either side has pointed to that helps us with the interpretation. The Vogel case, we think, is right on point from the Court of Customs and Patent Appeals. And Simon, I believe, ignores Vogel and focuses on the dicta of that case, but let's look at what the holding said. In that case, Jones argues that Section 119 gives rise to a right of priority that is personal to the United States applicant. Therefore, an application made by an inventor's assignee in a foreign country cannot be the basis for priority unless made on his behalf. Carrying this logic one step further, the existence of an application made by that assignee in a foreign country on behalf of one other than the United States inventor is irrelevant to his right of priority. Based on an application made on his behalf, the Court said we agree with that interpretation. And the Board here and the District Court both applied and indicated that they were relying on Vogel, and as the Board stated, our view is consistent with the opinions set forth in Vogel. That's a JA-267. I wanted to turn to the hypothetical that my colleague mentioned with respect to the commoditization of patent rights. What the Board said was that a contrary interpretation, in other words, Simon's interpretation, would cause entitlement to benefit to be negotiable as a commodity between unrelated entities. Now, Simon's answer to that is to say that concern will be taken care of by the fact that both applications have to disclose the same invention. But, of course, that's what interferences are all about. Interferences are often declared as a result of two patent applications disclosing and claiming the same invention. Simon never answers the possibility that here there was a three-way interference that either party Fogarty or party Martin could have assigned its rights to Simon and then claimed priority back to those European applications that they had nothing to do with and that they knew nothing about. We would submit that that offends the principles of the U.S. patent system because it makes patent rights available to the highest bidder. We think that the Board and the District Court understood that. There was another reason why we asserted this in our briefs, that the District Court and the Board got it right. Section 119 has to be interpreted to be consistent with other portions of the patent statute. And we think Simon's position is inconsistent with the best mode requirement under Section 112. In answering the reply brief from Simon, this Court's precedent states that in the context of a priority claim under 35 U.S.C. Section 119, one looks to the foreign application and its filing date to determine the adequacy of the best mode disclosure and not to the filing date of the corresponding U.S. application. That's Judge Rich's opinion from the Transco Products case 38F3-551. If a foreign application was not filed with the inventor's knowledge, then any legal representatives or assigns would have no idea that that application complied with the best mode requirement because, of course, the best mode requirement has a subjective element to it. The Board and the District Court holding it consistent with that interpretation, we believe Simon's does not. Finally, I wanted to turn to the Paris Convention arguments. This is a complete red herring argument. First, the District Court did consider and dismissed Simon's Paris Convention arguments at JA14, noting that the concern expressed by Simon that upholding the Board's construction of Section 119 would have in foreign countries is conjecture and based on pure speculation, citing the Kawai case. But at any rate, Medtronic does not contest that European applications can form the basis for a climate priority, and there's no question that under the District Court's interpretation, a party can successfully claim priority to a foreign application under the appropriate circumstances. But not in the same way. And so why doesn't, even if the treaty doesn't compel our interpretation, why doesn't it at least inform our interpretation in a way that's consistent? It's not consistent. I mean, you're saying in some circumstances it may end up having the same result, but it is not completely consistent. I would submit, Your Honor, that the purpose of the Paris Convention was to allow, and we can go back to the cases such as the Steele v. Myers case, the Dijon case, which refer to Section 119. We can infer from those that the purpose for Section 119 was to allow for that practice where in foreign countries applications are filed by corporations, but they're still filed on behalf of the vendors. And so in a circumstance, in most normal circumstances, what ends up happening is a foreign corporation will file an application. Wait, how do we know it's most? I mean, you argued that the other side was conjecture and speculation. How do we know that your most is not the same? I don't think we do know that, and I also don't think we know that under their circumstance that they've asserted that it's going to affect millions of applications that are filed or millions of patents that have already issued. But the fact is all we know is that there's a divergence, at least in certain respects there's a divergence between the treaty and the current interpretation of 119 under this case, right? There may be a divergence. I mean, I believe that under the district court's interpretation, what the district court did was apply the plain meaning, and what the district court said is that the Paris Convention, under its interpretation, the requirements of the Paris Convention will still be met under normal circumstances. I think what we have here is a situation where as a result of this interference, Simon attempted to manipulate the process to try to get the earliest possible inception date for purposes of winning the interference, and as a result has now raised this novel issue about what the meaning of Section 119 is. But at any rate, and this is an argument that Simon does not address in his reply brief, I don't believe, Commissioner Mossehoff, who was our expert, indicated that if there is some inconsistency between Section 119 and the Paris Convention, then the only way to remedy that is through the mechanisms that are provided in Article 64 of the TRIPS report, and then through some type of act of Congress. So, and that's at JA 704 through 729, that's Dr. Mossehoff's report. So, in conclusion, we believe that the board and the district court did get it right. Their reading of Section 119 is consistent with the statute's plain meaning. It's consistent with the precedent. It's consistent with the remaining sections of the patent code, and it does no offense to the Paris Convention. Now, if you would like to hear on Issue 2, I could address that by recognizing that my colleague did not address Section 2. Right, so I don't think we need to get into it. Thank you, Your Honor. Could I ask just one further question about, just to make sure I understand your position with respect to whether a corporation applying on behalf of an employee would be within the scope of 119. You say it is within the scope? Right, and I think, Your Honor, if you look at what the board said on its decision on reconsideration, it's JA 389. What the board said is, Party Craig admits that no document reflects that Mintak, that was the predecessor of Mintris, was the assignee or legal representative of Dake, the inventor of the account, as of February or June 1994. And it went on to say, this is not a case in which an employer who owned the right to an invention by its employees or assineurs has filed the European applications, in which case it might be reasonably argued by Party Craig that Mintak filed on behalf of whichever employees were the inventors. So I believe the board did consider that. Thank you. I'll try to limit myself to four points in rebuttal. First of all, I think I did, in the opening argument, answer the question about commodification. We couldn't buy Fogarty's rights because that's not for the same invention. The notion of same invention in an interference as we have here is not the notion of same invention as in Section 119 or in Vogel. When we talk about same invention there, Vogel limits it to the same invention rising out of the acts of the same inventors. Since Craig and Dake didn't work with Fogarty, didn't work with Martin, we paid a billion dollars to those people and it still wouldn't bring their priority rights to that foreign application that we're claiming priority to because that wasn't for that invention as invented by the inventors here. Secondly, my colleague on the other side brought up the best mode argument. I think we've answered this in our reply brief in particular, but best mode is not a requirement that has to be demonstrated for a foreign application to claim priority. We've cited the Crumlish case in our brief that explains in part that difference, but the basic difference is this, that to be an application that we can claim priority to, the invention has got to be described and enabled. Those are requirements of Section 112.1 under the key wire KY decision, but best mode is not one of those things that has to be shown to be an anticipating reference that we can claim priority to. So that should answer the best mode argument. The third comment is with regard to the Paris Convention. My colleague said that the treaty can inform the interpretation of the statute and that their interpretation does no offense to the statute. Well, Judge Prost, with regard to whether it's millions or hundreds of thousands or at least this one application that's the subject of the Northern District of California action that we cited in our Rule 28J letter, there clearly is an effect. In ordinary, regular national filings, as pointed out in the declarations of Professor Adelman, of Mr. Crumb, of Dr. Getty, in the EPO, in the UK, in Germany, and you could look at on and on and you would see this in the other jurisdictions as well over the world. Assignments are not made beforehand. If assignments are made at all, they're made only after the fact. And then finally, with regard to the discussion about what the scope of a legal representative is with regard to whether a corporation is a legal representative or not, well, in a sense that's not presented by this case, but in a sense it is, because if legal representative means any relationship between the filer and the inventor, first of all, you can't explain the Northern District decision that we've given to you. But on top of that, what do you do in the case, for example, of joint inventors where one inventor is with the corporation and the other isn't and the corporation files the application in a foreign country? The corporation perhaps is the representative of the employee, but not of the other inventor who's outside the corporation. And that is, for all intents and purposes, what we have here. We have Dave who's not with the company, but was working with Pratt to invent the particular subject matter here, the count. Well, I suppose it depends on how loose the concept of agency is in that setting. Well, and in fact, Judge Bryson, I think that really points out to me what you didn't hear from my colleague on the other side, and that is anything about timing. We've heard about what legal representatives are. What we didn't hear is why the language of the statute compels the answer that they have to have had that status at the time. Indeed, you could understand legal representatives in the science to have such a, you use the term loose, I would say broad, flexible, to accommodate formal practices, the notion of agency that allows for somebody to become an agent like this after the fact of the filing. And here, it wouldn't do any violence to the United States patent scheme or to the international patent treaties by allowing that to happen. Quite the contrary, the Vogel case limits it to the same invention, again, meaning the same work by these same inventors. And so what we have here in Section 119A in the interpretation is the commodification concern that drove the board decision, that drove the district court decision, is already addressed. Other portions of the statute already do all of that work for us. We don't need the legal representatives in a science language to do that work as well. And here, interpreting it in our way, consistent with the Paris Convention, consistent with Charlie and Betsy, and doesn't create international tension. Thank you. Thank you. Case is submitted.